*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

| | |
|---|---|
| ENTERTAINMENT PRODUCTIONS, INC., PLATINUM ROSE, INC., 777 MEMPHIS, INC., MANHATTAN, INC., and TENNESSEE ENTERTAINMENT CONCEPTS, INC., Tennessee Corporations; 2882 LAMBS PLACE, L.L.C., a Tennessee Limited Liability Company; 600 MARSHALL ENTERTAINMENT CONCEPTS, LLC, a Tennessee Limited Liability Corporation, <br><br> *Plaintiffs-Appellants*, <br><br> *v.* <br><br> SHELBY COUNTY, TENNESSEE, a Political Subdivision of the State of Tennessee; CITY OF MEMPHIS, a Tennessee Municipal Corporation, <br><br> *Defendants-Appellees*, <br><br> ROBERT E. COOPER, JR., Tennessee Attorney General, <br><br> *Intervenor Defendant-Appellee*. | No. 11-6396 |

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:08-cv-2047—J. Frederick Motz, District Judge.

Argued: December 6, 2012

Decided and Filed: July 9, 2013

Before: BOGGS, MOORE, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** J. Michael Murray, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio, for Appellants. Robert B. Rolwing, SHELBY COUNTY, TENNESSEE, Memphis, Tennessee, for Appellee Shelby County. Steven A. Hart, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee Attorney General **ON BRIEF:** J. Michael Murray, Raymond V. Vasvari, Jr.,

BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio, for Appellants. Robert B. Rolwing, SHELBY COUNTY, TENNESSEE, Memphis, Tennessee, Roane Waring III, CITY OF MEMPHIS, Nashville, Tennessee, for Appellee Shelby County. Steven A. Hart, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee Attorney General.

BOGGS, J., delivered the opinion of the court, in which SUTTON, J., joined, and MOORE, J., joined in the result. MOORE, J. (pp. 22–24), delivered a separate opinion concurring in the judgment.

---

**OPINION**

---

BOGGS, Circuit Judge.  In this second chapter of the litigation over Shelby County Ordinance 344, Entertainment Productions, Inc., *et al.*, seek to resuscitate their case against Shelby County and the State of Tennessee after a final judgment against them in the district court below.  The appellants, a group of business entities that collectively own a substantial fraction of the adult nightclubs in Memphis, seek to enjoin and invalidate the Tennessee Adult-Oriented Establishment Registration Act of 1998, as locally enforced by Ordinance 344.  They assert that the Act violates the First Amendment under a variety of theories.  We disagree.  For the reasons set out below, we affirm the district court.

I

We have chronicled the facts of this case in detail elsewhere.  *Entm't Prods., Inc. v. Shelby Cnty.* (Entm't Prods. I), 588 F.3d 372, 376–77 (6th Cir. 2009).  The Act at issue is a county-option state law, enacted to address the deleterious secondary effects associated with adult-oriented businesses, including crime, the spread of venereal disease, decreased property values, and other public-welfare and safety issues.  The Act applies to all businesses falling within the statutory definition of "adult-oriented establishment."  These establishments are regulated in two principal ways.  First, all businesses subject to the Act, as well as their employees, must obtain a license.  Second, the Act regulates the manner in which entertainment may be provided by these

establishments in four major ways: (1) it prohibits nudity; (2) it prohibits certain sexual activities, touching of certain anatomical areas, and all physical contact during performances; (3) it prohibits the sale or consumption of alcohol on the premises; and (4) it requires that all performances take place on a stage at least 18 inches above floor level and that all performers stay at least six feet away from customers and other performers.

Shelby County adopted the Act in September 2007. The appellants filed suit against the county in January 2008 in the United States District Court for the Western District of Tennessee. Claiming that the Act violated the First Amendment, they sought declaratory relief and preliminary and permanent injunctions. The Tennessee Attorney General moved to intervene, which the district court permitted in March 2008. The court subsequently denied the appellants' request for a preliminary injunction the following month. We affirmed this decision. *Entm't Prods. I*, 588 F.3d at 395.

Proceeding on remand, the appellants based their First Amendment argument on three different theories: (1) facial invalidity under intermediate scrutiny, (2) overbreadth, and (3) vagueness. The district court granted summary judgment for the appellees as to all claims except the claim of facial invalidity attacking the reasonableness of the Ordinance's coverage of establishments featuring "briefly attired" dancers. After a bench trial, the district court upheld the regulation as to this final challenge.

II

We review the district court's grant of summary judgment *de novo*. *Trs. of the Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 590 (6th Cir. 2000). The decision below may be affirmed only if the pleadings, affidavits, and other submissions show "that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, we draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

We also review *de novo* the sole claim that proceeded to trial, as it challenges the constitutionality of a state statute. *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 734 (6th Cir. 2000).

### III

The appellants' first argument does not focus on any single provision of the Act, but rather attacks the statute as a whole. The appellants claim that the Act fails intermediate scrutiny because the data used to justify the regulations are "shoddy." They criticize the methodology employed by the myriad studies cited by the state,[1] and offer their own statistical data showing no correlation between the existence of adult-oriented businesses and a number of the secondary effects that the appellees seek to eliminate. The appellants further charge that, regardless of the reliability of the data used, the Act impermissibly regulates the secondary effects of adult-oriented speech by eliminating the speech itself. Specifically, they claim that the regulations reduce the accessibility of erotic entertainment to a point that the nightclubs would rather leave the market than be regulated.

### A

The Act regulates the exhibition of erotic dance, a form of symbolic speech or expressive conduct. *Richland Bookmart, Inc. v. Knox Cnty., Tenn.* (Richland Bookmart II), 555 F.3d 512, 520 (6th Cir. 2009). Though protected by the First Amendment, "'nude dancing of the type at issue here is expressive conduct,' which falls 'within the outer ambit of the First Amendment's protection.'" *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 391 (6th Cir. 2001) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (plurality opinion)). Such speech receives protection, "'of a wholly different, and lesser magnitude.'" *Richland Bookmart, Inc. v. Nichols* [*Richland Bookmart I*], 137 F.3d 435, 439 (6th Cir. 1998) (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 70 (1976)).

---

[1] We refer primarily to the challenge against the state Act in this part, but the arguments apply with equal force to the county Ordinance, as it adopts the Act *in toto*.

We assess the constitutionally of regulations that purport to ameliorate the deleterious secondary effects of sexually oriented establishments under the intermediate-scrutiny standard announced in *City of Renton v. Playtime Theatres*, 475 U.S. 41 (1986). *Richland Bookmart II*, 555 F.3d at 523–24.  According to *Renton*, content-neutral regulations of the time, place, or manner of protected expression are valid "so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Renton*, 475 U.S. at 47.  Because these regulations are "actual regulation[s] of First Amendment expression," as opposed to regulations of conduct (*e.g.*, prohibitions on public nudity or the destruction of draft cards), we look first to the defendants to provide a connection between the regulations of protected speech and the adverse secondary effects that they seek to control. *Richland Bookmart II*, 555 F.3d at 523.

The state issuing the regulation must have "had a reasonable evidentiary basis for concluding that its regulation would have the desired effect.  Although not extraordinarily high, this evidentiary burden requires that the state show that the evidence upon which it relied was 'reasonably believed to be relevant to the problem' that the entity sought to address." *729, Inc., v. Kenton Cnty. Fiscal Ct.*, 515 F.3d 485, 491 (6th Cir. 2008) (quoting *Renton*, 475 U.S. at 51–52).  It need not produce new empirical data specific to the local situation that it seeks to abate. *Renton*, 475 U.S. at 51–52.  Indeed, there is no hard-and-fast rule that the government have *any* empirical data directly supporting a link between a given regulation and the secondary effect it is purported to ameliorate. *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438–39 (2002) (plurality opinion) (observing that such a requirement would undermine the settled position that municipalities must be given a reasonable opportunity to experiment with solutions to the problem of secondary effects); *id.* at 451 (Kennedy, J., concurring in judgment) ("[W]e have consistently held that a city must have latitude to experiment, at least at the outset, and that very little evidence is required.  As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners." (citations omitted)).  So long as the state is reasonable in

its belief that the evidence upon which it relied is relevant, it will meet this initial burden.

Once the state has established a substantial interest in regulating erotic speech, the burden shifts to the plaintiffs to "cast direct doubt" on the state's rationale for the challenged regulation. *Id.* at 438 (plurality opinion). They may do this "either by demonstrating that the [state's] evidence does not support its rationale or by furnishing evidence that disputes the [state's] factual findings." *Id.* at 438–39. Though the state is not allowed to "get away with shoddy data or reasoning," *id.* at 426, it is not "required to demonstrate empirically that its proposed regulations will or are likely to successfully ameliorate adverse secondary effects." *Richland Bookmart II*, 555 F.3d at 524. A state may rely upon a variety of data, including empirical studies from other states and cities, the laws and experiences of other jurisdictions, and prior court decisions. *84 Video/Newsstand, Inc. v. Sartini*, 455 F. App'x 541, 552 (6th Cir. 2011); *see also Alameda Books*, 535 U.S. at 439–40 (plurality opinion) (noting that the Court has never *per se* required empirical data); *Renton*, 475 U.S. at 51 ("We hold that [the defendant] was entitled to rely on the experiences of Seattle and other cities, and in particular on the 'detailed findings' summarized in the [state supreme court's] opinion, in enacting its adult theater zoning ordinance."). Additionally, "evidence suggesting that a different conclusion [by the legislature] is also reasonable does not prove that the [state's] findings were impermissible or its rationale unsustainable." *Richland Bookmart II*, 555 F.3d at 527. Rather, the defendants must show either that the data relied upon are irrelevant or that the government has drawn an unreasonable conclusion from those data.

Finally, and notwithstanding the reasonableness of the state's rationale, the statute must leave "the quantity and accessibility of speech substantially intact." *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring in judgment). Justice Kennedy did not expand upon this final requirement beyond noting that a state or municipality may not set out to reduce the secondary effects of adult speech by proportionally reducing the availability of the speech itself. *Id.* at 450–51 ("If two adult businesses are under the same roof, an ordinance requiring them to separate will have

one of two results: One business will either move elsewhere or close. The city's premise cannot be the latter.").   Justice Kennedy made his concurrence with the plurality contingent upon this requirement, *see ibid.* ("[T]he necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one may reduce the costs of secondary effects without substantially reducing speech."), which accordingly binds us.  *729, Inc.*, 515 F.3d at 491.

B

1

We have previously recognized the state's substantial interest in controlling the adverse secondary effects of sexually oriented establishments, "which include violent, sexual, and property crimes as well as blight and negative effects on property values." *Richland Bookmart II*, 555 F.3d at 524.  As evidenced by documents submitted by the state attorney general, the Tennessee Act and the Shelby County Ordinance purport to do the very same.  Both governmental entities embarked upon extensive fact-finding processes during the drafting of the respective provisions: The preamble of the 1998 Act references "convincing documented evidence" of the adverse secondary effects caused by sexually oriented businesses; the preamble to the Act's 1995 predecessor cites 15 municipal studies on the secondary effects of sexually oriented business, and 15 state and federal judicial opinions upholding similar regulatory schemes; before enacting the law, the legislature sought the opinion of the state attorney general, who vouched for the Act's constitutionality; and before Shelby County enacted Ordinance 344, it hired Duncan Associates, a Texas-based consulting firm, to make an additional set of findings based upon local crime statistics and in-person, undercover visits to a number of adult-oriented businesses in the area (including many of the appellants' businesses).

With this, the appellees easily clear *Renton*'s initial hurdle: Both the state and the county passed their respective legislation to advance a governmental interest that we have previously recognized to be substantial.  They relied upon ample empirical, legal, and anecdotal evidence that they reasonably believed to be relevant to the issues created by adult-oriented speech.  This evidence provided a reasonable basis for concluding that

the Act would have the desired effect of ameliorating the deleterious effects of erotic expression. The first step in our intermediate-scrutiny analysis is therefore satisfied.

2

Next, the burden shifts to appellants to show that the evidence presented does not support the rationale asserted or to furnish their own studies that dispute the state's findings. Appellants attack the Act on both fronts. They allege that the data relied upon by both the state and Shelby County are "fatally flawed" and additionally present their own research that purportedly negates the link between adult-oriented establishments and the deleterious secondary effects that the state wishes to control. However, we find no merit in either of these arguments. Viewing the appellants' evidence in the most charitable light possible, they have, at most, demonstrated that the methodological framework used to assess the relationship between adult-oriented businesses and the purported secondary effects of such businesses is subject to reasonable debate. This is to say that they have failed to show that the state's data have been *discredited*, thus making their reliance upon them unreasonable. What's more, the state relied upon a substantial amount of non-empirical evidence that appellants do not contest. Even if we do not consider the studies, the state is still entitled to summary judgment.

a

Appellants submitted a 36-page expert report by Dr. Daniel Linz that goes through each of the studies relied upon by the state and briefly explains how these studies are either methodologically flawed or irrelevant. Dr. Linz bases his criticism on an analytical framework expounded by himself and a group of colleagues in a 2001 article. *See* Daniel Linz et al., *Government Regulation of "Adult" Businesses Through Zoning and Anti-Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects*, 6 Comm. L. & Pol'y 355 (2001). The foundational premise of his argument is that a study must meet a *Daubert*-style definition of scientific validity before a state may reasonably rely upon it for the purposes of regulating adult-oriented businesses. *See id*. at 366–67, 391 (citing *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993)). He goes on to advance a four-point methodology for assessing the scientific validity of a

secondary-effects study: (1) the control area must be equivalent to the area containing the adult-oriented businesses in terms of crime, blight, and economic factors; (2) the study must assess the areas for a "sufficient period of elapsed time"—at least one year before and after the establishment of the adult-oriented business, according to Linz; (3) the source and types of crime data assessed must be similar (*e.g.*, if the control area is measured by calls for service, which he asserts is best, the test area must be measured by the same); (4) any survey research must be conducted in a proper, unbiased manner. *Id.* at 372–75.

In his report, Dr. Linz attacks all of the studies cited by the state for shortcomings related to his framework. For example, he claims that the 1979 Phoenix and 1986 Indianapolis studies are unreliable because both failed to account for differences in socio-economic conditions and property values between the sample and control areas. He attacks other studies, such as the 1977 Los Angeles survey, for failing to control for ramped-up police enforcement in the sampling area. Finally, he assails other studies, such as the 1983 Houston study, for not being empirical.

b

The appellants' argument fails as a matter of law for a variety of reasons. First and foremost, the foundational premise of their argument—that the state's evidence must pass muster under *Daubert* or some equivalent—is flatly wrong. Neither the Supreme Court nor this court has ever held that the First Amendment demands direct empirical support, let alone a specific methodology, to sustain a regulation on erotic expression. *Alameda Books*, 535 U.S. at 439–40 (plurality opinion); *id.* at 451 (Kennedy, J., concurring in judgment); *Richland Bookmart II*, 555 F.3d at 527. If a governmental entity need not rely upon direct empirical evidence, *a fortiori* it need not rely upon direct empirical evidence that meets a particular commentator's threshold of scientific validity.

As the Supreme Court observed in *Alameda Books*, this does not mean that governmental entities can rely upon "shoddy data." 535 U.S. at 438 (plurality opinion). This statement, however, does not mean that the state's evidence must hurdle some methodological bar before it may be relied upon. Rather, we understand the nature of

the state's ultimate burden—a *reasonable* belief of relevance—to set nothing more than a floor. States may not regulate erotic speech based upon evidence that is nongermane or, worse, nonexistent. Post-*Alameda Books* case law confirms this. Take for example the three cases upon which the appellants principally rely: *New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556 (7th Cir. 2009), *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460 (7th Cir. 2009), and *Abilene Retail # 30, Inc. v. Board of Commissioners of Dickinson County*, 492 F.3d 1164 (10th Cir. 2007). Addressing them in chronological order, *Abilene Retail* concerned a zoning ordinance passed in a rural county based upon the standard litany of urban-based secondary-effects studies. The Tenth Circuit reversed a grant of summary judgment because of a material dispute as to the relevance of the existing canon of studies to a non-urban setting. 492 F.3d at 1175–76. Next, the Seventh Circuit in *Annex Books* found a material question as to the relevance of data on the dispersal of businesses featuring live sexual entertainment to a set of regulations of the conditions and hours of operation of adult bookstores. 581 F.3d at 461–63. The Seventh Circuit again reversed a grant of summary judgment in *New Albany DVD*, where a municipality passed regulations of adult bookstores based upon threadbare anecdotal evidence that theft and pornographic litter tended to occur with higher frequency around such stores. 581 F.3d at 559–61.

In contrast, the State of Tennessee and Shelby County relied upon a vast array of germane, widely accepted evidence in passing their respective regulations. To the extent that the appellants ask the federal courts to declare this evidence insufficient, they ask the court system to effect a paradigm shift in empirical criminology through judicial decree, if not a fundamental restructuring of First Amendment law. Similar requests have been roundly rejected by our sister circuits, and we now join them. *See, e.g.*, *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 747–48 (4th Cir. 2010) ("So while the Linz study and others may well be of interest to legislatures or those formulating policy, it does not provide the kind of 'clear and convincing' evidence needed to rebut the government's showing and invalidate the regulation."); *Doctor John's v. Wahlen*, 542 F.3d 787, 791–93 (10th Cir. 2008) ("Even Doctor John's concedes that 'courts continue to rule that studies of secondary effects . . . do not have to meet the standard of

*Daubert*.' . . . [I]n light of the Supreme Court's rejection of this specific analysis by Dr. Linz, we see little need to continue." (alterations in original)); *Daytona Grand, Inc. v. City of Daytona Beach*, 490 F.3d 860, 882–83 & n.33 (11th Cir. 2007) ("We also note that at least three other circuits have rejected, for similar reasons, attempts by plaintiffs to use studies based on [call-for-police-service] data to cast direct doubt on an ordinance that the municipality supported with evidence of the sort relied upon by the City of Daytona Beach here. Interestingly, Daniel Linz, one of the experts hired by Lollipop's, also co-authored the studies found to be insufficient in two of these cases." (citations omitted)); *Gammoh v. City of La Habra*, 395 F.3d 1114, 1126–27 (9th Cir. 2005) ("The Appellants' proffered expert [Linz] declared that the City's evidence was flawed because 'systematically collecting police call-for-service information' and adhering to the Appellants' suggested methodological standards were 'the only reliable information' that could have supported the City's concern. This is simply not the law."); *G.M. Enters., Inc. v. Town of St. Joseph*, 350 F.3d 631, 639–40 (7th Cir. 2003) ("Plaintiff argues that its complaint must survive summary judgment because the evidence relied upon by the Board does not meet the standards of *Daubert v. Merrell Dow Pharmaceuticals*. Under the plaintiff's view, the Town cannot demonstrate a reasonable belief in a causal relationship between the activity regulated and secondary effects, as required by *Alameda Books* and *Renton*, unless the studies it relied upon are of sufficient methodological rigor to be admissible under *Daubert*. This argument is completely unfounded." (citations omitted)).

We do not suggest that Dr. Linz's work is flawed. To the contrary, we construe it in the most charitable light possible. However, the most we may fairly say of his work is that it is a minority viewpoint within the secondary-effects literature. As suggested by two of our sister circuits[2]—and as we state clearly now—federal court is simply not

_____

[2] *See Imaginary Images*, 612 F.3d at 749 ("None of this is to say that Virginia's policy is unassailable or even right. But the primary means to challenge legislative misconceptions is through the channels of representative government: hearings, speeches, conversations, debates, the whole clamorous drama of democracy that leads to the enactment of the given law. In the First Amendment context, those affected by restrictions designed to combat secondary effects may of course demonstrate that the justification for a particular restriction rests on 'shoddy data or reasoning.' But to invoke the power of the judiciary to set the policy aside, such evidence must be sufficiently convincing to 'prove[ ] unsound' the government's justification for its policy."); *G.M. Enters.*, 350 F.3d at 639–40 ("*Alameda Books* does not

the appropriate forum for Dr. Linz and his colleagues to wage methodological combat with other studies on the secondary effects of adult speech. At best, the appellants have demonstrated that the State of Tennessee and Shelby County faced a choice between two reasonable alternative viewpoints when assessing the need for the challenged regulations. The appellants effectively ask us to second-guess the deliberative judgments of both legislative bodies. We decline to do so.

c

Though the foregoing analysis amply supports the district court's grant of summary judgment on the appellant's intermediate-scrutiny argument, we briefly note that the appellants would not prevail even if we did not consider the contested studies. The state may rely upon "*any* evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." *Alameda Books*, 535 U.S. at 438 (plurality opinion) (emphasis added) (quoting *Renton*, 475 U.S. at 51–52). This includes "land-use studies, prior judicial opinions, surveys of relevant professionals (such as real-estate appraisers), anecdotal testimony, police reports, and other direct and circumstantial evidence." *84 Video/Newsstand*, 455 F. App'x at 549. The studies assailed by the appellants are but one piece of a larger body of evidence relied upon by both the state and the county, which included the experiences of other states and municipalities, judicial opinions, crime statistics, anecdotes from police, their own prior experiences with regulating adult-oriented businesses, and plain common sense. Even if we count the reasonableness of the state's reliance upon these studies as disputed, the district court's decision is supported by the uncontested, non-empirical evidence in the record.

---

require a court to re-weigh the evidence considered by a legislative body, nor does it empower a court to substitute its judgment in regards to whether a regulation will best serve a community, so long as the regulatory body has satisfied the *Renton* requirement that it consider evidence 'reasonably believed to be relevant to the problem' addressed.").

C

The district court separately considered the issue of whether the state was reasonable in its belief that the same body of data justified regulation of "briefly attired dancers."[3]  After a bench trial, the district court ruled in favor of the state, relying upon our opinion in *Richland Bookmart II*, 555 F.3d at 529–30.  The appellants' primary quarrel with the district court's opinion appears to be that it credited the testimony of Dr. Richard McCleary, the state's expert, over that of Dr. Linz.  Factual disputes such as this are reviewed only for clear error, *Morrison v. Colley*, 467 F.3d 503, 506 (6th Cir. 2006), and we find none.

The appellants additionally cite *R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402 (7th Cir. 2004), as establishing that the existing body of secondary-effects literature is devoid of a link between non-nude dancing and the adverse effects that the state and the county wish to ameliorate.  This argument, however, represents a misunderstanding of the applicable First Amendment case law and of *R.V.S.* itself.  As discussed in detail in the previous section, a state or municipality is not obliged to produce direct evidence of a link between a particular activity that it wishes to regulate and the secondary effects that it wishes to mitigate—it need only produce evidence that it reasonably believed to be relevant to the problem and upon which it reasonably relied in concluding that the regulations passed would have the effects desired.  *See 729, Inc.*, 515 F.3d at 491.  Furthermore, *R.V.S.* falls into the previously discussed category of cases in which a federal court has struck down an adult-entertainment regulation due to a total absence of evidence relied upon by the state or municipality.  *See* 361 F.3d at 405 ("[I]t is undisputed that the City Council did not rely on any studies from other towns or conduct any of their own studies . . . . The Ordinance does not contain any preamble or legislative findings and the journal of proceedings for the City Council meeting at which it was adopted does not state any findings.").  Thus, *R.V.S.* neither conflicts with nor bears

---

[3]By "briefly attired," we understand appellants to mean "entertainers who are distinctly not nude, but are clad in bikinis, swimsuits, and other materials which, while opaque, do not completely cover the entire buttocks, or all portions of the breast below the topmost portion of the areola." *Entm't Prods. I*, 588 F.3d at 383 (internal quotation marks omitted).

upon our prior case law holding that it is reasonable for governments to conclude that establishments featuring scantily clad dancers pose the same types of problems as establishments featuring nude and semi-nude entertainment. *Entm't Prods. I*, 588 F.3d at 383 (citing *Richland Bookmart II*, 555 F.3d at 529–30).

## D

The appellants mount a final effort to strike down the Act under intermediate scrutiny by threatening to shut down if they lose. They argue that the Act fails Justice Kennedy's proportionality requirement from *Alameda Books*, 535 U.S. at 450 (Kennedy, J., concurring in judgment), because the appellants' exit from the adult-entertainment market would cause a rapid decrease in the quantity and accessibility of adult speech. *See ibid.* The appellants submitted two affidavits by two nightclub proprietors, which speak of the economic impact that the Act—namely the ban on the sale or consumption of alcohol at their clubs—would have on their business. At oral argument, counsel for the appellants stated that his clients' nightclubs have ceased production of nude and semi-nude entertainment, choosing to operate as bikini bars so as to avoid regulation by the Act. The county confirms that no bar has filed for a license to operate as an adult-oriented business in Shelby County since the January 2013 effective date of Ordinance 344.

In *Alameda Books*, the Supreme Court assessed the effects of a Los Angeles zoning ordinance on the availability of adult speech. The challenged ordinance prohibited the operation of multiple adult businesses in a single building, on the theory that a concentration of adult-oriented businesses bred higher crime rates. 535 U.S. at 430–31. In his decisive concurrence, Justice Kennedy posited that a proper *Renton* analysis must "address how speech will fare under the [challenged] ordinance." 535 U.S. at 450. He observed:

> [T]he necessary rationale for applying intermediate scrutiny is the promise that . . . ordinances like this one may reduce the costs of secondary effects without substantially reducing speech. For this reason, it does not suffice to say that inconvenience will reduce demand and fewer patrons will lead to fewer secondary effects. . . . It is no trick to

reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech.

*Ibid.*

We applied this framework in our opinion in *729, Inc.* 515 F.3d at 492–93. At issue was the constitutionality of a "cooling off" provision—a one-hour period after a performance during which erotic entertainers could not come within five feet of a patron. *Id.* at 490. We held that, though the regulation did affect speech by preventing dancers from being physically present in a particular area for a particular period of time, it did not run afoul of *Alameda Books. Id.* at 493. The regulation served a substantial governmental interest in minimizing customer–entertainer contact that carried a risk of prostitution and did so in a manner that substantially preserved erotic speech. *Ibid.* It neither banned communication between customers and entertainers outright (affected performers could communicate with patrons while still complying with the buffer-zone restriction) nor substantially reduced the opportunity to engage in protected conduct (it affected only those dancers performing on that night within the preceding hour). *Ibid.*

Turning to the issue before us, we have no trouble making the initial conclusion that Ordinance 344 serves a substantial governmental interest. It seems almost too obvious to say that the combination of intoxicating beverages and erotic entertainment can be extremely volatile, and that banning the consumption of alcohol at adult-oriented businesses may reduce a variety of secondary effects. This common-sense observation is supported by the findings contained in the Duncan Associates report, which uncovered instances of patrons drinking "to the point of total inebriation," coupled with numerous violations of state and local laws proscribing customer–patron sexual contact. The report further suggested that the combination of drinking and sexual stimulation increased the risk of patrons become targets for crime, as these individuals are likely to "have their guard down." This conclusion is, in some sense, too narrow, in that it does not take into account the increased risk that the intoxicated, sexually stimulated patrons may themselves engage in criminal activity, *e.g.*, soliciting performers for sex, exposing themselves in public, and like crimes.

Our analysis becomes more complex when we turn to the proportional impact that this regulation has on the availability of adult speech in Shelby County. The appellants would have us believe that because they have voluntarily ceased production of adult entertainment, the availability of protected adult speech has dropped to zero. However, their argument ultimately proves too much. The appellants do not allege that the alcoholic-beverage ban would damage their revenue stream so profoundly that it makes their businesses unprofitable. Rather, they allege that the ban would merely make their clubs *less* profitable. Though they do not specify how much their profits would be reduced were they to stay in the adult-entertainment business, it is telling that an owner of one of the defendant clubs operates an alcohol-free cabaret in Nashville. Although he notes that the Nashville club is less profitable than his other clubs, compliance with the ban has clearly not driven him from the market.

At bottom, we understand the appellants to make the following argument: Compliance with the alcoholic-beverage ban would reduce their profits. This reduction in profits results in a situation where it is more profitable to operate outside of the Ordinance's coverage as a bikini bar than it is to operate within the Ordinance's coverage as a strip club. Being rational actors, the appellants choose to convert their establishments into the more lucrative bikini bars, resulting in a substantial drop-off in the availability of erotic speech. Accordingly, they theorize, the Ordinance cannot pass muster under *Alameda Books*.

The problem with this argument is that it ignores the fact that any reduction in the availability of erotic speech is due not to the operation of the Ordinance, but to the appellants' economic choice to invest their resources elsewhere. This scenario is categorically different from the ones faced in *Alameda Books*, where Justice Kennedy expressed concern that municipalities could enact zoning ordinances to force adult-oriented businesses to close, and in *729, Inc.*, where this court scrutinized a local cool-down provision to ensure that it did not directly effect a substantial reduction in the opportunities for erotic expression. Shelby County did not premise its alcoholic-beverage ban on the elimination of adult speech, and the ban imposes neither a crushing

financial burden nor a direct and substantial curtailment of opportunities for erotic expression. It merely regulates the types of revenue-generating activities that proprietors of adult-oriented businesses may conduct.

It is not enough that the ban, combined with outside forces such as the relative demands for striptease, bikini contests, and alcohol, result in an economic climate where it is more lucrative to operate a non-nude club with alcohol than a nude club without. Were this sufficient to sustain a proportionality argument under *Alameda Books*, it is hard to see how any government action that alters the economic calculus of adult-oriented businesses would not potentially violate the First Amendment. Suppose that Shelby County decided to discourage nude and semi-nude entertainment not by regulating adult-oriented businesses, but by subsidizing non-adult-oriented businesses. Giving financial breaks to comedy clubs, disco bars, and the local theatre may well create an economic choice similar to the one presented here, yet it is patently absurd to say that such action would violate the First Amendment. The appellants' legal theory would expand Justice Kennedy's concurrence beyond any recognizable limiting principle, and we accordingly reject it.

IV

The appellants' next set of challenges relate to the statutory definitions of "adult-oriented establishments," "adult cabaret," and "adult entertainment." They attack these critical terms, which ultimately define the scope of the Act's coverage, under theories of overbreadth and void-for-vagueness. We previously addressed the meaning of these terms during our review of the appellants' request for a preliminary injunction. *Entm't. Prods. I*, 588 F.3d at 383–89. We denied the preliminary injunction after finding that the operative terms were susceptible to a narrowing construction that would clearly exempt mainstream artistic venues, thereby curing any potential overbreadth and sufficiently clarifying any portion of the Act allegedly contaminated by vagueness. *Id.* at 389, 394–95.

Appellants' arguments here are, in substantial part, an attempt to relitigate that finding. However, "[u]nder the law-of-the-case doctrine, findings made at one point in

the litigation become the law of the case for subsequent stages of that same litigation." *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002). We generally will not disturb these findings unless there is "(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (internal quotation marks omitted). The appellants claim that the Supreme Court's intervening opinion in *United States v. Stevens*, 130 S. Ct. 1577 (2010), vitiated our analysis in *Entertainment Productions I*. They read *Stevens* to circumscribe our ability to apply a narrowing construction to potentially overbroad terms, such that we must revisit our prior holding. However, we find no new principle of First Amendment law in *Stevens* that affects our analysis, and appellants' counsel could not point us to one during oral arguments.

The *Stevens* Court struck down a federal law that criminalized the commercial creation, sale, or possession of "a depiction of animal cruelty," which the statute defined as "[one] in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed," if that conduct violates federal or state law where "the creation, sale, or possession takes place." *Id.* at 1582 (quoting 18 U.S.C. § 48 (a), (c)(1) (amended 2010)). The Court found no language in § 48 that would delineate acts that are traditionally considered animal cruelty, such as the "crush videos" that were the original target of statute, from arguably protected speech, such as depictions of hunting and livestock slaughter. *Id.* 1588–89. Rather, the statute's criminal scope was a function of the legality of the act depicted in the jurisdiction in which it was made, thereby subjecting citizens to a "bewildering maze of regulations from at least 56 separate jurisdictions." *Id.* at 1589.

The appellants point us not to what the Court held, but rather to what it did not. They argue that the Court's rejection of the government's various defensive arguments elucidates a new and deeper understanding of the overbreadth doctrine. This argument, however, reads too much into a rudimentary application of preexisting law to an overbroad statute. The government first argued that the phrase "depiction of animal

cruelty" should be construed to require an accompanying act of cruelty. *Id.* at 1588. The Court rejected this argument out of hand:

> The Government contends that the terms in the definition should be read to require the additional element of "accompanying acts of cruelty." The Government bases this argument on the definiendum, "depiction of animal cruelty" . . . .
>
>     . . . .
>
> But the phrase "wounded . . . or killed" at issue here contains little ambiguity. The Government's opening brief properly applies the ordinary meaning of these words, stating for example that to "'kill' is 'to deprive of life.'" We agree that "wounded" and "killed" should be read according to their ordinary meaning. Nothing about that meaning requires cruelty.

*Ibid.* (citations omitted). The government next argued that the statute's exemption clause, which carved out "any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value," 18 U.S.C. § 48(b) (amended 2010), protected speech that contained "anything more than scant social value." *Id.* at 1590 (internal quotation marks omitted). The Court again rejected this argument as an "unrealistically broad reading of the exceptions clause." *Ibid.* This left the government with only a bare assertion of prosecutorial discretion, which the Court rejected forcefully by stating that "the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *Id.* at 1591.

To the extent that the Court may have appeared exceptionally strict in its analysis of the proposed narrowing constructions, it is likely because those proposed constructions were exceptionally weak. We discern no new principle of First Amendment law flowing from the Court's opinion. Indeed, the *Stevens* Court began its analysis exactly where we began ours: by citing *United States v. Williams*, 553 U.S. 285, 293 (2008), for the proposition that "[t]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Compare Stevens*, 130 S. Ct. at 1587, *with Entm't Prods. I*, 588 F.3d at 381. Our analyses diverged at this point because the

Court found that "animal cruelty" was not readily susceptible to a narrowing construction in light of the plain-text definition of the phrase, while we found the opposite with regards to "adult-oriented establishments," "adult cabaret," and "adult entertainment." Having presented no persuasive reason for us to revisit our prior interpretation of the Act, we adhere to our ruling in *Entertainment Productions I* and reject the appellants' overbreadth and void-for-vagueness arguments.

V

The appellants make two final arguments unrelated to the First Amendment. They first argue that Ordinance 344 is preempted by Section 7–51–1121(b) of the Act, which states

> Notwithstanding any provision of subsection (a) or any other law to the contrary, if a city or other political subdivision in this state chooses to enact and enforce its own regulatory scheme for adult-oriented establishments and sexually-oriented businesses [sic], then this part shall not apply within the jurisdiction of such city or other political subdivision.

Appellants suggest that this provision preempts enforcement of the Act in Shelby County because the City of Memphis and the county have a number of other provisions that address sexually oriented businesses. Appellants' suggested reading contradicts the provision's plain text. This section does quite the opposite of preemption: it allows localities to enact and enforce their own regulatory schemes without fear of being preempted by the state. We focus specifically on the operative verb of the provision —"choose." If a city or other political subdivision chooses to enact and enforce its own regulatory regime, then the state opt-in regime does not apply. If, however, the political subdivision chooses to opt into the state regulatory regime, as Shelby County has done here, then it only makes sense that the Act applies. The appellants have not shown how any county or city ordinance conflicts with the operation of the Act. They present no argument as to why the Act should be preempted, save the fact that both the county and the city have other laws that touch on the same subject matter. We reject this argument.

Finally, appellants claim they were prejudiced by an erroneous denial of a motion to compel the City of Memphis to produce a number of police reports and crime-data sheets. According to the magistrate judge's order, the appellants sought the production of "essentially all records and reports relating to crimes within the city limits over a five-year time period." *Entm't Prods. v. Shelby Cnty.*, No. 08-2047-D/P (W.D. Tenn. Apr. 28, 2009). The magistrate judge denied the request as overly broad and irrelevant, and the district court affirmed. We agree. Though the parties generally may discover any unprivileged evidence relevant to their claim, Fed. R. Civ. P. 26(b)(1), the district court may limit discovery due to irrelevance and burdensomeness. *Surles ex rel. Johnson v. Greyound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007). We have previously ruled that litigants challenging an adult-entertainment regulation are not entitled to discovery regarding localized manifestations of secondary effects, as a state or municipality need not rely upon this data in order to pass a valid regulation. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 466 F.3d 391, 398 (6th Cir. 2006). Since the discovery sought would not resolve any factual disputes that could entitle the appellants to relief, their request "falls more in the category of a fishing expedition," and the district court did not err in denying it. *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).

VI

For the foregoing reasons, we **AFFIRM** the district court.

---

## CONCURRENCE IN THE JUDGMENT

---

KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.  I write separately to address the district court's grant of summary judgment.  In my view, the district court's decision is supported by the simple fact that plaintiffs failed to address defendants' public health, safety, and welfare rationales for introducing the Act.

Under the burden-shifting framework announced in *City of Los Angeles v. Alameda Books, Inc.*, defendants have the initial burden of putting forth "any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest."  535 U.S. 425, 438 (2002) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52 (1986)).  Then the burden shifts to plaintiffs to "cast direct doubt on this rationale, either by demonstrating that [defendants'] evidence does not support [their] rationale or by furnishing evidence that disputes [defendants'] factual findings."  *Id.* at 438–39.  "If plaintiffs succeed in casting doubt on [defendants'] rationale in either manner, the burden shifts back to [defendants] to supplement the record with evidence renewing support for a theory that justifies [the Act]."  *Id.* at 439.  This case concerns the second step, when the burden is on plaintiffs.

As both the district court and majority opinion note, our cases make clear that "evidence suggesting that a different conclusion is also reasonable does not prove that the County's findings were impermissible or its rationale unsustainable."  *Richland Bookmart, Inc. v. Knox County*, 555 F.3d 512, 527 (6th Cir. 2009).  With this, both opinions hold that summary judgment was appropriate.  To me, relying on this proposition of law to grant summary judgment in favor of defendants undermines the wisdom of the burden-shifting mechanism.  Frankly, it is exceptionally unclear from our cases what evidence plaintiffs needed to present to raise a genuine issue of material fact as to whether they have cast doubt on defendants' rationale for introducing the Act.

Given this uncertainty, I think that the issue is more suited for trial than summary judgment.

Noting this concern, I would nonetheless affirm the district court's grant of summary judgment because plaintiffs failed to present any evidence that casts doubt on the public health, safety, and welfare rationales for introducing the Act.  The district court aptly noted in granting summary judgment in favor of defendants:

> Dr. Linz analyzed studies on property values and crime relied on by the County and the State.  Dr. Linz' critiques and supplemental studies did not extend to the spread of sexually transmitted diseases or any other public health, safety, and welfare issues, and Plaintiffs submitted no other evidence to counter the County's and State's concerns on those issues.  As such, Plaintiffs have failed to shift the burden of proof from themselves back to the County with regard to the City's public health concerns.

R. 123 (9/29/09 D. Ct. Order at 13) (Page ID #4727).  Given that plaintiffs failed to raise any doubt on the public health, safety, and welfare rationales for adopting Act, plaintiffs failed to shift the burden back to defendants.  *See 84 Video/Newsstand, Inc. v. Sartini*, 455 F. App'x 541, 552 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 1637 (2012) ("Linz's testimony and studies fail to cast doubt on the entire body of evidence relied on by the General Assembly, including those secondary-effects studies not discussed by Linz and the significant quantity of other types of evidence relied on by the Legislature with which Linz does not engage, including prior court decisions, news reports, and anecdotal testimony by law enforcement officials and others."); *see also Heideman v. South Salt Lake City*, 165 F. App'x 627, 631–32 (10th Cir. 2006) ("Simply put, the record does not contain any evidence to counter the City's concern over unsanitary conditions or the possibility of public health concerns associated with unregulated nude conduct in adult business establishments. . . .  Accordingly, Plaintiffs failed to shift the burden of proof from themselves back to the City.").  Instead of heightening plaintiffs' burden at summary judgment to meet some unknown (or perhaps unattainable) evidentiary burden to create a genuine issue of material fact as to whether they have cast doubt on defendants' rationale, I would hold simply that plaintiffs were required to cast doubt on

each rationale presented by defendants.  Because plaintiffs failed to address all of defendants' rationales, the district court did not err in granting summary judgment in favor of defendants, and therefore I concur in the judgment.